**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LEONARD REICHART,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 05 C 3621** |
| | ) | **Magistrate Judge Nan R. Nolan** |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Leonard Reichart seeks judicial review of the final decision of the Defendant Commissioner of Social Security finding Reichart disabled from April 26, 1999 through June 5, 2000, but not thereafter.  Cross motions for summary judgment are pending.  For the reasons stated below, Plaintiff's Motion for Summary Judgment [19] is denied and Defendant's Motion for Summary Judgment [21] is granted.

## I.     Procedural History

Reichart filed applications for Disability Insurance Benefits and Supplemental Security Income on August 27, 1999, alleging disability due to injuries to his arms and pelvis. (Tr. 117-19, 136).  Reichart's insured status for DIB purposes expired on June 30, 2001.  Reichart had to show that he was disabled on or before that date.  The state agency denied Reichart's claim initially and upon reconsideration.  (Tr. 89-92, 95-97).  Following a hearing, ALJ Mondi issued a partially favorable decision finding Reichart disabled from his alleged onset date of April 26, 1999 through June 5, 2000, but not thereafter.  (Tr. 79-87).  Reichart appealed, and the case was remanded because the tape recording of the

administrative hearing could not be located.  (Tr. 111-13).  The ALJ held a supplemental hearing and issued another decision finding Reichart disabled from April 26, 1999 through June 5, 2000, but not thereafter.  (Tr. 24-31).  The Appeals Council denied review, leaving the ALJ's decision as the final decision of the Commissioner.  (Tr. 9-12).  Reichart seeks judicial review of this decision pursuant to 42 U.S.C. § 405(g).

## II.    Factual Background

### A.    Background and Reichart's Testimony

Reichart was forty-seven years old on the date of the ALJ's decision on December 29, 2004.  (Tr. 25).  He completed the ninth grade (Tr. 142).  His past work included jobs as a roofer and a roof inspector.  (Tr. 25).

At the hearing, Reichart complained of pain in his pelvis radiating down the left side of his leg, pain in his arms ,and swelling in his hands.  (Tr. 52-53, 59).  Reichart described the pain in his arms as like "getting shock going down" his arm or the feeling when "your foot's asleep and there's 1,000 needles pricking at it."  (Tr. 61).  He stated that the pain in his arms interferes with his ability to sleep.  (Tr. 61-62).  Reichart takes hydrocodone and aspirin or Tylenol when needed.  (Tr. 54-55).  Reichart rated his pain on a scale of one to ten as an eight or nine without medication, and as a five with medication.  (Tr. 63).  He reported that he medications made him drowsy, and that he slept half of the day.  (Tr. 56).

Reichart stated that he could lift no more than five pounds with his right arm and three to four pounds with his left arm.  (Tr. 52-53).  He testified that he cannot walk around the block or around a grocery store.  (Tr. 53).  Reichart does not do housework.  (Tr. 67). He relies on his wife and son to perform household chores.  Id.

### B.    Mindy Reichart's Testimony

Mindy Reichart, Reichart's wife, testified at the administrative hearing.  Ms. Reichart stated that Reichart's overall condition was worse.  (Tr. 58).  She said that his condition prevented him from helping around the house with the exception of picking up clothes that were laying around.  (Tr. 57-58).  She further stated that she can send Reichart to the store for a loaf of bread, but if she need anything that weighed more, he could not do it.  (Tr. 58).  Ms. Reichart testified that she mows the lawn and has been doing so since 2001.  (Tr. 60).

### C.    Medical Evidence Prior to April 26, 1999, Plaintiff's Alleged Onset Date

Reichart injured his right elbow on September 20, 1989.  (Tr. 270-73).  He underwent surgery in February 1990 and again in April 1991.  (Tr. 262, 269-70).  By early 1992, Reichart was released to return to work but recommended to avoid lifting more than 50 pounds on more than an occasional basis, lifting more than 20 pounds on more than a frequent basis, lifting more than 10 pounds on more than a constant basis, frequent, repetitive movements with bilateral upper extremities, pushing objects with greater than 120 pounds, pulling objects with forces greater than 71 pounds, and to continue practicing good body mechanics.  (Tr. 258, 278).

### D.    Medical Evidence Between April 26, 1999 and June 5, 2000, the Period During Which Plaintiff was Found Disabled

On April 26, 1999, Reichart was working as a roofer and fell off a ladder.  (Tr. 288).  He sustained fractures of his left pelvis and left radial head.  (Tr. 288-89).  He underwent surgery to repair his left radial head fracture.  (Tr. 290).  In January 2000, Reichart complained of numbness and pain in his left hand over the last several months.  (Tr. 307).  Dr. Richard Angell, an orthopedic surgeon, ordered an EMG.  Id.  Drs. Angell and Brian E.

O'Shaughnessy, a neurologist, noted some clinical evidence of radial nerve dysfunction, but an EMG and nerve conduction study did not show radial nerve dysfunction. (Tr. 305-06). Dr. O'Shaughnessy stated that the radial nerve dysfunction "may be too mild and proximal to show up on" the electrodiagnostics studies. (Tr. 306). Dr. Angell prescribed a non-narcotic pain reliever and recommended follow-up tests in two months. (Tr. 305).

A follow-up EMG/NCV from March 2000 was essentially normal, except for some abnormalities found in the pronator teres muscle. (Tr. 324-25). At the request of Dr. Angell, Dr. Richard Thomas examined Reichart later that month. (Tr. 328-30). Reichart complained of significant numbness and tingling to the thumb, index and middle finger of the left hand, coldness of the hand, and achiness of the whole hand and sometimes into the forearm. (Tr. 328). Dr. Thomas diagnosed left median neuropathy, both proximally at elbow and carpal tunnel. (Tr. 330). Dr. Thomas recommended surgical decompression of the median nerve, and Reichart agreed. Id

On April 20, 2000, Reichart visited Dr. Thomas for his preoperative history and physical. (Tr. 330). Reichart reported significant pain to his left arm. Id. The physical examination revealed that the left arm had positive Tinel's at the antecubital fossa and proximal to that, positive Tinel's at the carpal tunnel, and digital compression test was positive. Id. The rest of the examination was normal with the exception of a right breast scarring from a childhood surgery. Id. On April 24, 2000, Dr. Thomas performed a left median nerve decompression at the elbow and left carpal tunnel release. (Tr. 331). On April 26, 2000, Dr. Thomas examined Reichart and noted satisfactory postoperative convalescence. On May 8, 2000, Reichart reported feeling much better. (Tr. 332). He stated his numbness and tingling has improved tremendously. He still had some tingling

but the sensation had improved tremendously, and he was having no pain. Id. The physical examination revealed that both wounds were well healed. The sutures were removed without difficulty. Id.

On June 5, 2000, Reichart reported that he was quite pleased with the early results of his surgery. (Tr. 332). He stated that his deep, achy pain was gone. He was having much less numbness into his hand, but his thumb was still somewhat numb and tingly. Id. A physical examination revealed that the surgical wounds were well healed. Id. The elbow range of motion was at his preoperative level. The scar was minimally tender at the antecubital fossa area and palm. The digital motion was excellent. Id. Two point discrimination was intact at 5 millimeters in all digits including the thumb. Id. Reichart's grip strength was 95 pounds on his right side and 40 pounds on his left side. Dr. Thomas directed Reichart to begin an aggressive strengthening program and continue with scar massage. Id.

### E. Medical Evidence After June 5, 2000

On July 13, 2000, Reichart reported having much less discomfort in his hand and arm. (Tr. 333). He stated he was quite pleased with the results of his surgery. Reichart also reported some numbness in the thumb and some lateral elbow pain which persisted. Id. Dr. Thomas' assessment after physical examination was: excellent outcome status post left median nerve decompression at antecubital fossa, medial arm and carpal canal. Dr. Thomas gave Reichart a full release. Dr. Thomas told Reichart that he could resume activities as tolerated but may always have some discomfort in his elbow. Id.

Reichart returned to Dr. Thomas on September 20, 2000. (Tr. 333). Reichart reported that he had been doing well but then gradually had repeated left arm pain. He

stated that he had been doing exercises with 60 pounds of lifting and this increased his discomfort. Id. Reichart stated he now had difficulty lifting even small weight secondary to pain which he felt coursed from the circumferential wrist up the forearm to the lateral aspect of his elbow and upper arm. He also reported some residual numbness and tingling, but it was still better than prior to his most recent decompression. Id. X-rays of the left elbow revealed evidence of the radial head excision and mild degenerative changes in the ulnar joint surfaces. (Tr. 334). Dr. Thomas told Reichart that he had nothing further to add to his care and that some of his symptoms would most likely remain residual for him. Dr. Thomas opined that Reichart was at his maximum medical improvement and recommended a work capacity/functional capacity evaluation. Id.

Between January 9 and September 7, 2001, Reichart participated in occupational therapy at Provena Mercy Center. (Tr. 337-59, 362-88). On January 31, 2001 and after ten treatment sessions, a therapist reported that Reichart had partially met his short and long term goals. (Tr. 342). On March 2, 2001 and after another nine treatment sessions, a therapist reported that Reichart had again partially met his short term and long term goals. (Tr. 345). On March 6, 2001, Reichart stated his pain was an 8 out of 10 on his left elbow to hand. After completing his therapy session, Reichart reported that his pain had decreased to 6 out of 10. Id. On April 4, 2001, Reichart stated that he felt good on some days and in a lot of pain on some days. (Tr. 355). On April 6, 2001, a therapist reported that Reichart had met his short term goals and partially met his long term goals. (Tr. 347). On April 16, 2001, Reichart indicated that he had pain in his left arm/hip when vacuuming and reaching on a shelf to dust. (Tr. 357). On that same day, Reichart carried a gallon crate overhead and shoulder. Id. Reichart also reported that a desensitization program

was helping him decrease his pain.  Id.  On April 25, 2001, Reichart reported mowing his

lawn and stated "I'll never do that again!"  Id.  That same day, Reichart rated his pain level

as a 10 out of 10.  (Tr. 358).  On May 11, 2001, Reichart reported that he had rented a

motor scooter and went to a race the prior weekend.  (Tr. 381).

Between May 18 and September 7, 2001, Reichart attended 30 occupational therapy

sessions at Provena Mercy Center.  (Tr. 362, 368, 372, 376).  On June 18, 2001, Reichart

reported that his activities continue to take increased time and effort and caused him

increased pain.  (Tr. 377).  He stated that he was able to accomplish more things, such as

doing dishes,  if he used his right hand and proper technique.  Id.  On August 20, 2001, a

therapist noted that Reichart's pain continues to fluctuate ranging from 5-9 out of 10.  (Tr.

366).  The therapist further noted that Reichart has consistently attended therapy and has

gained independence with therapy.  Id.  However, his activities still required increased time

and effort.  The therapist noted that Reichart was restricted by his decreased ability to lift

heavy weight repeatedly.  Id.  The therapist recommended a functional capacity evaluation.

Id.  On that same day, Reichart reported that he could do light, quick meal preparation with

no prolonged amounts of standing.  (Tr. 369).  He also stated that he can perform light

cleaning, carry a gallon of milk, a six pack of soda, and light groceries.  Id.  Reichart stated

that he could not vacuum, dust, perform car repairs, mow the grass, make the bed, scrub

floors, or perform home maintenance.  Id.  On September 7, 2001, Reichart reported the

ability to perform these same activities of daily living.  (Tr. 363).

By letter dated September 17, 2001, Dr. M. Hamed Ali stated that Reichart had been

under his care for the last several months.  (Tr. 360).  Dr. Ali stated that Reichart suffers

from chronic, recurrent low back pain, pelvic pain, left arm pain and reflex sympathetic

dystrophy of the left arm after median nerve repair and fracture of pelvic.  Id.  Dr. Ali further stated that Reichart had completed physical therapy at Mercy Center Hospital with little improvement.  Dr. Ali opined that Reichart could not perform sedentary work and should be awarded disability benefits.  Id.

On March 26, 2002, a three phase bone scan was performed on Reichart's left arm. (Tr. 393).  Jonathan Limpert, M.D., reported decreased vascularity and decreased activity on blood pool images with normal delayed images consistent with the earliest stage of reflect sympathetic dystrophy (RSD), also known as Complex Regional Pain Syndrome (CRPS).[1]  Id.  He opined that the findings would fit with RSD brought on by recent trauma. Dr. Limpert further stated that if the symptoms were longstanding, one would expect that stage II or stage III findings would be present.  Id.  Dr. Limpert concluded his impression by stating: "Please correlate with the timing of the symptoms which would determine the probability that reflex sympathetic dystrophy accounts for the mild asymmetry seen here." Id.  On December 20, 2001, Dr. Ali reported that Reichart "still has RSD and still [is] disabled [from] work."  (Tr. 396).

On April 19, 2002, Dr. Pradeep Bhatia opined that Reichart has RSD and as a result, is disabled.  (Tr. 391).  Dr. Bhatia referred to the bone scan report.  Id.  On December 2, 2002, Dr. Bhatia reported that Reichart has RSD in his left arm and it appears that he may be developing it in the right arm also.  (Tr. 389).  Dr. Bhatia opined that Reichart remains

---

[1] Reflex sympathetic dystrophy is a chronic pain syndrome.  It is defined as persistent burning pain accompanied by certain abnormalities that occur in the same area as the pain.  Abnormalities include increased or decreased sweating, swelling, changes in skin color, and damage to the skin, hair, nails, muscle, and bone.  RSD typically occurs after an injury to tissues other than nerve tissue.  See The Merck Manual of Medical Information–Second Home Edition.

disabled.  Id.  An x-ray of Reichart's lumbar spine on January 3, 2003 showed only mild degenerative changes.  (Tr. 406, 407).  On January 13, 2003, Dr. Bhatia referred Reichart to Dr. Mohammad Kahn, a pain management specialist and anesthesiologist, for management of his RSD in his left upper extremity because Reichart had failed conservative measures.  (Tr. 390, 406).

On December 20, 2003, Dr. Ali reported that Reichart "still has RSD and still [is] disabled [from] work."  (Tr. 396).  On December 29, 2003, Dr. Khan opined that Reichart has CRPS (Complex Regional Pain Syndrome) in his left upper extremity and it is getting worse.  (Tr. 395).  He indicated that Reichart was unable to afford an injection.  Dr. Khan opined that Reichart is "definitely" disabled from work due to CRPS.  Id.  On January 17, 2004, Dr. Bhatia confirmed that Reichart has developed RSD in his left hand and probably early RSD in the right hand.  (Tr. 396).  Dr. Bhatia indicated that Reichart had undergone treatment and was advised to continue disability indefinitely.  Id.

On June 10, 2004, Charles J. O'Laughlin, Jr., M.D., an orthopaedic surgeon, examined Reichart.  (Tr. 397-400).  Dr. O'Laughlin also spent approximately 30 minutes reviewing Reichart's prior medical records.  (Tr. 400).  Reichart reported taking a pill and a half or two of Norco, a pain medication he was given by Dr. Khan.  (Tr. 397).  Reichart reported having trouble with numbness of the left hand specifically of the thumb and index finger.  Id.  Dr. O'Laughlin reviewed x-rays from after Reichart's surgery of the left elbow and resection of the radial head.  (Tr. 398).  Dr. O'Laughlin stated that the x-rays showed no evidence of complication, no excessive calcification, good bone mineral content, and no evidence of any atrophic bone or demineralized bone that would be present with reflex sympathetic dystrophy.  Id.  On direct exam, Dr. O'Laughlin noted that Reichart had a "little

bit" of a limp on the left leg but he tended to exaggerate his symptoms with the limp.  Id.
Dr. O'Laughlin further opined that Reichart "tends to exaggerate his symptoms in terms of
loss of balance and strength."  (Tr. 399).  Dr. O'Laughlin noted good pulses and good
sensation in both lower extremities.  Id.

Dr. O'Laughlin stated that Reichart did not appear to have any significant back
condition although he complained of pain occasionally down the left buttock which had not
resulted in any neurologic deficit or objective physical finding. Id. Dr. O'Laughlin noted that
Reichart claimed decreased sensation of the index finger and left thumb of the left hand.
Dr. O'Laughlin further noted that Reichart had sweating and the hand felt relatively warm.
Id.  The left hand was not cold or clammy.  Dr. O'Laughlin stated that Reichart did not have
"any of the physical characteristics of reflex sympathetic dystrophy.  There is really no
atrophy that is present in the skin or thickening of the skin or excessive sweating that would
indicate any type of reflex sympathetic dystrophy.  There are similar findings on both
extremities.  The patient states that he was advised that he may have early reflex
sympathetic dystrophy of the right upper extremity and again there is no evidence of that
on exam." Id. Dr. O'Laughlin noted that the EMG findings of Reichart's left upper extremity
in January and March 2000 were "really minimal."  (Tr. 400).

Dr. O'Laughlin concluded that Reichart's physical complaints "are not substantited
by objective physical findings" and "are out of proportion [with] his physical findings.  (Tr.
400).  Dr. O'Laughlin further stated that Reichart's limp was "exaggerated" and there were
no "physical findings to verify his subjective complaints."  Id.  Dr. O'Laughlin found that
Reichart retained the residual functional capacity to occasionally lift and/or carry 50 pounds
and frequently lift and/or carry 25 pounds.  (Tr. 401).  He further found that Reichart's ability

to stand and/or walk or sit was not affected.  (Tr. 401-02).  Dr. O'Laughlin found Reichart's ability to push and/or pull was limited in his upper extremities.  Dr. O'Laughlin stated: "Left upper extremity from a prior injury to his left elbow and left hand.  He had a fracture of the left elbow of the radial head and has some residuals in terms of inability to do heavy work with lifting, pushing, and pulling."  (Tr. 402).  With respect to postural limitations, Dr. O'Laughlin stated: "Climbing with ropes and scaffolds would be difficult to do if not impossible.  Ladders could be done but probably for 2-3 hours a day only.  Lower extremity activities are not restricted."  Id.  Dr. O'Laughlin found that Reichart had some decreased sensation in his left hand from a prior nerve injury and this may affect fine fingering activities, but he could frequently finger and feel.  (Tr. 403).  Finally, Dr. O'Laughlin opined that Reichart had no visual/communicative or environmental limitations.  (Tr. 403-04).

On December 3, 2004, Reichart underwent an MRI of his pelvis.  (Tr. 429).  The physician's impression was "[e]vidence of old left anterior pelvic fracture without any acute fracture, destructive lesion or significant degenerative change in the hips."  Id.  Three days later, Reichart underwent an MRI of the lumbar spine as a result of lower back pain and left leg pain.  (Tr. 427).  The physician's impression of the MRI of the lumbar spine was: some minimal loss of signal within the substance of the L4-L5 and L5-S1 disks compatible with some disk degeneration; some mild annular bulging of the L4-L5 and L5-S1 disks; evidence of radial tears of the L4-L5 and L5-S1 disks; tiny broad-based disk protrusion at L5-S1; and disk space narrowing and degeneration of T12-L1 with minimal annular bulging of the disk. Id.

On January 26, 2005, Reichart saw Dr. Khan and complained of pain in the lower

back. (Tr. 430-32). Reichart described the pain as mainly in the left side of the lower back,

sharp and shooting in nature and radiates along the back of the thigh to the toes. (Tr. 430).

With respect to Reichart's back pain, Dr. Khan recommended a transforaminal lumbar

epidural steroid injection initially. (Tr. 431). If the transforaminal injection does not work,

Dr. Kahn recommended treating the most painful disc either with a nucloplasty or intradiscal

electrothermal therapy or a surgeon can do a fusion if minimally invasive treatment does

not help. Id. Dr. Khan concluded:

> I would also comment that his upper extremity pain is clearly a complex
> regional pain syndrome that was proven by bone scan. The bone scan was
> read by Dr. Jonathan Limpert at Rush-Copley Hospital and his impression
> was decreased vascularity and decreased activity on blood pool images with
> normal delayed images as seen here that can be seen in the early stages of
> reflex sympathetic dystrophy. That was mentioned on the report. The date
> is March 26, 2002. The patient has subjective complaint of complex regional
> pain syndrome. The reason I am mentioning this in my dictation today is in
> response to one of the doctors, the orthopedic physician, who wrote that he
> doesn't think this patient has RSD. The patient has complex regional pain
> syndrome. He is explaining complex regional pain syndrome with the patient
> nicely because he is telling that the patient has nerve injury. Usually with the
> history of nerve injury if the patient has allodynia and hyperpathia also bone
> scan changes go in favor of RSD so I think the doctor is just confused about
> the fact of complex regional pain syndrome. Mr. Reichart did very well after
> stellate ganglion block so diagnostic tests and everything go in favor of
> complex regional pain syndrome. I think the doctor has to deny the
> radiologic finding and also a note from the neurologist. He has explained it
> very nicely and the radiologist has the finding and I have both clinical and
> physical findings of complex regional pain syndrome. I believe the patient
> has complex regional pain syndrome. The patient cannot use his arm. We
> are trying to give him a good quality of life with the treatment of complex
> regional pain syndrome. It is frustrating but a lot of time the patient gets
> better and I am seeing Mr. Reichart is doing very well. Right now I will be
> treating him for his low-back pain as well as complex regional pain syndrome.

(Tr. 431-32.).

**F.      ALJ's Decision**

The ALJ found Reichart disabled from April 26, 1999 through June 5, 2000, but not thereafter. (Tr. 29-30). Specifically, the ALJ found that as of June 5, 2000, Reichart "had experienced medical improvement and had the residual functional capacity for light work not involving climbing ladders, ropes, scaffolding, or more than occasional climbing of ramps and stairs." (Tr. 28). Given this RFC, Reichart is unable to perform his past relevant work as a roofer. (Tr. 28). In light of the vocational expert's testimony at the first hearing, the ALJ concluded that Reichart could perform a significant number of jobs in the local economy and therefore, was not disabled. (Tr. 29).

## III.  DISCUSSION

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). In order to determine whether a claimant is disabled within the meaning of the Act, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently gainfully employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, see 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is able to perform her former occupation; and (5) whether the claimant is unable to perform any other available work in light of her age, education, and work experience. 20 C.F.R. § 404.1520(a) (2004); Clifford v. Apfel, 227 F.3d 863, 868 (7th Cir. 2000). These steps are to be performed sequentially. 20 C.F.R. § 404.1520(a). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other

than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled."

Clifford, 227 F.3d at 868 (quoting Zalewski v. Heckler, 760 F.2d 160, 162 n.2 (7th Cir. 1985)).

Judicial review of the ALJ's decision is limited to determining whether the ALJ's findings are supported by substantial evidence or based upon a legal error. Stevenson v. Chater, 105 F.3d 1151, 1153 (7th Cir. 1997). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971). This Court may not substitute its judgment for that of the Commissioner by reevaluating facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. Estok v. Apfel, 152 F.3d 636, 638 (7th Cir. 1998).

The ALJ denied Reichart's claim at Step 5, finding that by June 5, 2000, Reichart retained the residual functional capacity to perform a limited range of light work. Reichart raises two main challenges to the ALJ's decision: (1) the ALJ's credibility determination is not supported by substantial evidence and (2) the ALJ erred in failing to give controlling weight to the medical opinions of Drs. Ali, Bhatia, and Khan. Neither of Reichart's arguments warrant reversal or remand. Because Reichart's arguments are inter-related, the Court addresses them together.

Reichart first challenges the ALJ's credibility determination as not supported by the record. The ALJ found Reichart's allegations of disabling pain and functional limitations after June 5, 2000 not credible. (Tr. 27). Social Security Ruling 96-7p states that ALJs must provide "specific reasons" for a credibility finding. ALJs must also evaluate the credibility of the claimant's testimony about his symptoms in light of seven factors: (1) daily

-14-

activities, (2) the location, duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) the type, dosage, effectiveness, and side effects of medication, (5) treatment, (6) other measures used to relieve the pain, and (7) other factors concerning functional limitations.  SSR 96-7p.  An ALJ's credibility determination is entitled to "special deference" and will be reversed only if it is "patently wrong."  Scheck v. Barnhart, 357 F.3d 697, 703 (7th Cir. 2004); Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000).

The ALJ gave specific reasons for his credibility finding, and substantial evidence supports the ALJ's credibility findings.  The ALJ found that Reichart's claim of disabling pain and functional limitations after June 5, 2000 was inconsistent with the medical evidence in the record.  (Tr. 27).  The ALJ noted that the medical evidence documented significant improvement following Reichart's surgery in April 2000.  (Tr. 25-28).  The ALJ noted that following a left median nerve decompression at the elbow and left carpal tunnel release on April 24, 2000, Reichart reported being "quite pleased" with the early results of the surgery. (Tr. 27, 332).

By early May 2000, Reichart reported that he was "almost 100% better" and "having no pain."  (Tr. 332).  In June 2000, Reichart stated he was "quite pleased " with the results of his surgery and reported that "his deep, achy pain is gone."  (Tr. 332).  On examination, Dr. Thomas documented elbow range of motion at his preoperative level of 10/145, scar minimally tender, excellent digital motion, intact two-point discrimination, and grip strength of ninety-five pounds with his right hand and forty pounds with his left hand.  (Tr 332).  In July 2000, Reichart reported some persistent lateral elbow pain but stated he was "quite pleased" with the results of his surgery.  (Tr. 333).  While Reichart complained of left arm pain in September 2000 after lifting sixty pounds, Dr. Thomas documented good digital

motion, intact two-point discrimination, and slight valgus instability. (Tr. 333-34). X-rays

of the left elbow showed only mild degenerative changes at the ulnar joint surfaces. (Tr.

334). On September 20, 2000, Dr. Thomas concluded that Reichart had reached

maximum medical improvement and that some of his symptoms would likely remain

residual for him. (Tr. 334).

The ALJ noted that a May 2002 three-phase bone scan (almost a year after his

insured status expired) showed evidence of RSD in Reichart's left arm and what was later

characterized as "developing" RSD in his right arm but concluded the diagnosis did not

establish limitations precluding light work during the interim or even thereafter, given

Reichart's right-hand dominance. (Tr. 27).[2] The ALJ also observed that Reichart saw

doctors infrequently after June 2000 and rented a motor scooter in May 2001 to attend a

race. (Tr. 27). The ALJ permissibly relied in the part on the opinions of Drs. Pilapil and

---

[2] While the ALJ stated that the three-phase bone scan demonstrated evidence of RSD, it is not clear to the Court that the bone scan report contains a conclusive diagnosis of RSD. In his impression of the bone scan, Dr. Limpert stated that "[d]ecreased vascularity and decreased activity on blood pool images with normal delayed images, as seen here, can be seen in the earliest stages of reflex sympathetic dystrophy." (Tr. 409). Dr. Limpert further noted that "[i]f the symptoms are longstanding, one would expect that stage II or stage III findings . . . would be present in this patient." Id. Dr. Limpert concluded by stating, "[p]lease correlate with the timing of the symptoms which would determine the probability that reflex sympathetic dystrophy accounts for the mild asymmetry seen here." Id. Drs. Bhatia and Khan appear to have simply assumed the bone scan conclusively demonstrated RSD without addressing Dr. Limpert's statement that the timing of the symptoms should be considered to determine the probable applicability of RSD (Tr. 391, 431). In any event, the ALJ gave Reichart the benefit of the doubt and found evidence of RSD based on the bone scan. (Tr. 27). At most, the March 2002 bone scan demonstrated "mild" asymmetry and the "earliest stages" of RSD. (Tr. 409). The fact that Reichart was diagnosed with the earliest stages of RSD almost a year after his insured status expired does not establish that he was completely disabled during the relevant period. See Estok v. Apfel, 152 F.3d 636, 640 (7th Cir. 1998) (holding "[i]t is not enough to show that [claimant] had received a diagnosis of fibromyalgia with a date of onset prior to the expiration of the insured period, since fibromyalgia is not always (indeed, not usually) disabling.").

Donnelly, state agency physicians, who reviewed the record and concluded in September 1999 and March 2000 that Reichart could perform medium work that involved no climbing ladders, ropes, or scaffolds, and only occasional climbing of ramps and stairs. (Tr. 314-21). See Dixon v. Massanari, 270 F.3d 1171, 1178 (7th Cir. 2001) (stating "[w]hen treating and consulting physicians present conflicting evidence, the ALJ may decide whom to believe, so long as substantial evidence support that decision.").

Reichart argues that the ALJ impermissibly discounted the diagnosis of several of his physicians (Drs. Ali, Bhatia, and Khan) that his RSD prevented him from working. Substantial evidence supports the ALJ's decision not to accord controlling weight to the opinions of Reichart's doctors that he was disabled. It is important to note that Reichart's current medical condition is not at issue. His condition before his insured status expired on June 30, 2001 is key. Reichart bears the burden of demonstrating that he is disabled on or before the date his insured status expired. Estok, 152 F.3d at 640; Meredith v. Bowen, 833 F.2d 650, 655 (7th Cir. 1989). "The law requires that a claimant demonstrate her disability within the proscribed period of eligibility not prior to or subsequent to the dates in question." Jeralds v. Richardson, 445 F.2d 36, 39 (7th Cir. 1971). Therefore, "any condition that had its onset or became disabling after plaintiff's insured status expired may not be used as a basis for entitlement to disability insurance benefits." Couch v. Schweiker, 555 F.Supp. 651, 654 (N.D. Ind. 1982).

Substantial evidence supports the ALJ's determination that Reichart was not disabled as of the date his insured status expired on June 30, 2001. Drs. Bhatia and Kahn did not diagnosis Reichart as totally disabled until after his insured status expired. Dr. Bhatia first diagnosed Reichart with RSD and found him "disabled from working currently"

on April 19, 2002. (Tr. 391). Dr. Bhatia's note referred only to the bone scan of Reichart's left arm dated March 26, 2002. (Tr. 391, 393). Neither Dr. Bhatia's April 19, 2002 note nor his subsequent notes dated January 13, 2003 (Tr. 424) and January 7, 2004 (Tr. 425) stating his diagnosis of RSD and opinion of disability indicate that Reichart's RSD had its onset or became disabling before June 30, 2001. Similarly, Dr. Khan first diagnosed Reichart's Complex Regional Pain Syndrome on December 29, 2003, nearly two and a half years after his insured status expired. (Tr. 417). Dr. Khan's RSD diagnosis was based on the March 26, 2002 bone scan and Dr. Bhatia's diagnosis. (Tr. 431-32).[3]

Reichart argues that the ALJ erred in discrediting Dr. Khan's finding in late December 2003 that he has CPRS in his left upper extremity which is getting worse and Dr. Bhatia's opinion in January 2004 of left hand RSD and "probable early RSD in the right hand." (Tr. 28, 395, 396). The ALJ properly found that even you credit these opinions, "they still do not establish limitations that would preclude all light and sedentary work, given claimant's right hand dominance, wide range of activities, and infrequent trips to the doctor for a lengthy period after June 5, 2000." (Tr. 28). Reichart claims that the ALJ's finding that he made "infrequent trips to the doctor for a lengthy period after June 5, 2000" is inaccurate because he made "regular and continuous" doctor's visits after June 5, 2000.

---

[3] The ALJ noted that Drs. Bhatia and Kahn opined that Reichart has RSD (or CRPS) and is disabled from work. (Tr. 28, 389, 395). The ALJ stated that he discounted these opinions because the "claimant's activities suggest that both doctors used the term 'disability' to reflect his inability to perform past heavy roofing work, consistent with claimant's concern during therapy that he needed to be able to lift heavy objects and use a crowbar." (Tr. 28). The Court need not decide whether it is reasonable to infer that the physicians were relating Reichart's disability to his prior work as a roofer because Reichart does not make this argument. Even if the ALJ's characterization is unfair, it is harmless because crediting Drs. Bhatia's and Kahn's opinions of RSD and disability does not establish that Reichart was disabled before June 5, 2001.

Reichart's argument is not supported by the record. The ALJ accurately characterized the record as showing only "infrequent trips to the doctor" after June 5, 2000. During the four and a half year period from June 6, 2006 through December 29, 2004 (the date of the ALJ's decision), the record demonstrates that Reichart visited his doctor only four times–July 13, 2000, September 20, 2000, February 19, 2003, and December 29, 2003. (Tr. 333-34, 416-17). The records cited by Reichart do not correspond to doctor visits; rather, they are notes from his occupational therapy program. The ALJ noted these therapy visits in his decision and accurately observed that Reichart attended occupational therapy three times per week from January until September 2001. Dr. Ali's "to whom it may concern" letters are also not evidence of doctor's visits because there are no corresponding examination notes or records from Dr. Ali in the record. (Tr. 322, 360). Finally, Reichart cites to a visit to Dr. Kahn on January 26, 2005. (Tr. 430). This report postdates the ALJ's decision and cannot be considered in determining whether substantial evidence supports the final decision of the Commissioner.

The only potential physician opinion of disability from the relevant time period is Dr. Ali's first note dated September 17, 2001.[4] (Tr. 360). Dr. Ali's note states in relevant part:

> Leonard Reichart has been under my medical care for the last several months. He had one fall as a roofer last year and has suffered several injuries. Mr. Reichart suffered from chronic recurrent low back pain, pelvic pain and Lt arm pain also reflex sympathetic dystrophy of Lt arm x median

[4] Another of Dr. Ali's notes is apparently dated January 15, 2001, prior to the date Reichart's insured status expired. That date cannot be right because Dr. Ali states in his note that Reichart completed physical therapy at Mercy Center Hospital. (Tr. 322). Reichart began physical therapy at Provena Mercy Center Hospital on January 9, 2001 and did not complete his physical therapy there until September 2001. (Tr. 337, 362). Because no explanation exists for this inconsistency, the Court disregards Dr. Ali's note dated January 15, 2001 as evidence of disability prior to June 5, 2001.

nerve repair and fracture of pelvic.  He still at this time can not perform any sedentary work for any short period of time Mr. Reichart should be awarded Social Security Benefits."  (Tr. 360).

Dr. Ali's note does not offer an explicit opinion on Reichart's RSD and disability onset. From Dr. Ali's statements that Reichart has been under his care for several months prior to September 17, 2001 and Reichart is still unable to work, it can be argued that it is reasonable to infer that Reichart's RSD had its onset prior to June 30, 2001.  Even if this inference is accurate, however, the ALJ properly gave Dr. Ali's opinion little weight.

An ALJ must "give controlling weight to the medical opinion of a treating physician if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with other substantial evidence.'" Hofslien v. Barnhart, 439 F.3d 375, 376 (7th Cir. 2006).  However, an ALJ may reject a treating physician's opinion when it does not meet this standard because a claimant is not disabled simply because his treating physician says so.  Dixon v. Massanari, 270 F.3d 1171, 1177 (7th Cir. 2001).  "The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability."  Id. (quoting Stephens v. Heckler, 766 F.2d 284, 289 (7th Cir. 1985)).

In his credibility analysis, the ALJ considered the September 17, 2001 opinion of Dr. Ali that Reichart could not perform any sedentary work for even a short period of time.  (Tr. 28, 360).  The ALJ afforded Dr. Ali's opinion reduced weight because  Dr. Ali's relationship with Reichart had only existed for "several months" and his opinion was inconsistent with Reichart's reported activities.  (R. 28).  The ALJ  articulated adequate reasons for rejecting Dr. Ali's statement on September 17, 2001 that Reichart was unable to work.  The ALJ properly rejected the September 2001 opinion because Dr. Ali had not been able to

observe Reichart over a prolonged period. "The advantage that a treating physician has over other physicians whose reports might figure in a disability case is that he has spent more time with the claimant." Hofslein, 439 F.3d at 377. Without evidence that a physician has a longitudinal perspective, there is no reason to accord his opinions greater weight. Scheck v. Barnhart, 357 F.3d 697, 702-03 (7th Cir. 2004).

Reichart criticizes the ALJ for stating that at the time of Dr. Ali's September 17, 2001 note, he had only been treating Reichart for "several months." Reichart claims he had a lengthy relationship with Dr. Ali which began on October 15, 2000. This argument is without merit. In observing that the treating relationship had only lasted for several months, the ALJ was quoting verbatim from Dr. Ali's own note. See Tr. 360 (stating Reichart "has been under my medical care for the last several months."). Other than Dr. Ali's purported January 15, 2001 "to whom it may concern" note which the Court is disregarding as evidence of disability prior to June 5, 2001 (see footnote 3), Reichart cites no evidence in the record to support his claim that he began treatment with Dr. Ali in October 2000.

As the ALJ noted in his first decision, Dr. Ali's conclusory opinion also lacked objective medical support. (Tr. 82; 83). See Henderson ex. Rel. Henderson v. Apfel, 179 F.3d 507, 514 (7th Cir. 1999) (stating "[a]n ALJ need not give controlling weight to a treating physician's opinion if it is not supported by objective clinical findings."). Although Dr. Ali diagnosed chronic, recurrent low back pain, pelvic pain, left arm pain, and RSD of the left arm post-median nerve repair and fracture of pelvic, the record contains no treatment notes from Dr. Ali. Additionally, Dr. Ali's note does not rely on any medically acceptable clinical and laboratory diagnostic techniques. Dr. Ali pointed to no clinical evidence supporting his disability finding. The ALJ's rejection of Dr. Ali's opinion was not error because it was not

supported by medical findings and was inconsistent with other evidence in the record, such as the medical opinions of the state agency physicians.

The ALJ also found Dr. Ali's assessment to be inconsistent with Reichart's activities, including renting a motor scooter to go to a race, cutting the grass, and going to the store alone. Reichart claims that these reasons for not finding him credible are not supported by substantial evidence or are factually incorrect. The ALJ accurately characterized Reichart's activities.

First, Reichart reported that he had rented a motor scooter to go to a race in May 2001. (Tr. 381). Reichart argues "that there is no indication in the Record at 381 as to whether the motorized scooter that was rented for the race was the type of scooter disabled persons use to mobilize themselves at an arena or stadium type setting." Pl's brief at 14.[5] Reichart's position that the scooter referred to in the occupational therapy notes may have been an assistive motor scooter is nothing more than speculation. The notes from Recihart's occupational therapy sessions focused on problems with his hands, and there is no evidence in the record that Reichart needed an assistive motor scooter. The ALJ characterization was reasonable in light of the therapy note, which stated that "patient reported he rented a scooter (motor) and went to a race last weekend." (Tr. 381). Reichart also criticizes the ALJ for relying on the fact that he rented a motor scooter and went to a race in May 2001 because the ALJ did not question Reichart about this activity at the administrative hearing. As the Commissioner points out, Reichart cites not authority for the proposition that an ALJ must question a claimant about every discrepancy that exists

---

[5] The ALJ did not find that Reichart used the motor scooter to participate in some sort of motorized scooter race as Reichart suggests in his brief. See Pl's brief at 16.

between his testimony and the other evidence in the record.  Moreover, Reichart's attorney could have questioned Reichart about this activity at the hearing.  <u>Sears v. Bowen</u>, 840 F.2d 394, 402 (7th Cir. 1988) (stating ALJ entitled to presume applicant represented by counsel at the hearing "made his best case.").  The ALJ properly relied on Reichart's motor scooter rental in his credibility analysis.

Reichart further complains that the ALJ mischaracterized the record with respect to his ability to mow the grass.  Ms. Reichart testified that she began mowing the grass  in 2001.  (Tr. 60).  The record further indicates that on April 25, 2001, Reichart reported at his occupational therapy session that he tried mowing the grass but would "never do that again!"  Reichart is correct that there is no evidence in the record indicating that Reichart mowed the grass during the period after June 5, 2001.  An ability to mow the law was therefore not a valid basis to find Reichart incredible.  The ALJ's misapprehension of the evidence regarding Reichart's ability to mow the lawn during the relevant time period, however, does not establish that the ALJ's credibility conclusion is patently wrong when considering the record as a whole.   Reichart does not explain how crediting his statement that as of April 25, 2001, he was unable to mow the law would change the outcome.  <u>Fisher v. Bowen</u>, 869 F.2d 1055, 1057 (7th Cir. 1989) (stating "[s]o the administrative law judge's opinion is vulnerable.  But that is nothing new.  No principle of administrative law or common sense requires us to remand a case in quest of the perfect opinion unless there is reason to believe that remand might lead to a different result.").  An inability to engage in strenuous activity like lawn-mowing does not demonstrate that Reichart was disabled to the extent that he could not work all after June 5, 2001.

Further, there was a slight discrepancy between the testimony of Reichart and his

wife regarding his ability to go to the store alone. Reichart testified that if they need a loaf of bread or a gallon of milk, he accompanies his wife to the grocery store and waits in the car for her. (Tr. 56). Reichart's wife testified that she can send him to the store alone for a loaf of bread. (Tr. 58). The ALJ properly considered the discrepancy between Reichart's testimony and his wife's testimony when assessing credibility, and the ALJ was entitled to accept Reichart's wife's testimony. An ALJ's credibility determination is entitled to special deference because of his unique ability to observe and evaluate testimony. Powers v. Apfel, 207 F.3d 431, 435 (7th Cir.2000); see also Clifford v. Apfel, 227 F.3d 863, 869 (7th Cir. 2000) (stating in conducting a substantial evidence determination, the court does not weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the Commissioner).

In his decision, the ALJ also stated that Reichart had the ability to carry a gallon of milk, a six pack of soda, and light groceries. (Tr. 26). Reichart asserts that there is no support for this statement because he did not testify to these abilities at the hearing. At hearing, Reichart testified that he could not carry a gallon of milk with his left arm. (Tr. 53). The ALJ did not state that Reichart's testimony was the basis for this finding. The ALJ cited the records from Reichart's occupational therapy program as the basis for his statement. (Tr. 26, 363). The September 7, 2001 occupational therapy treatment session note states that Reichart reported he could do light tasks such as dusting, carrying a gallon of milk, carrying a six-pack of pop, and a light weight grocery bag, which is consistent with the ALJ's finding. (Tr. 363; 369).

Finally, the record contains evidence that Reichart submitted to the Appeals Council after the ALJ issued his decision. (Tr. 420-33). As the Commissioner points out, much of

this evidence duplicated evidence in the record before the ALJ. With respect to the remainder of this supplementary evidence, Reichart has not requested a remand pursuant to sentence six of 42 U.S.C. § 405(g). To merit a remand pursuant to sentence six, Reichart must show that "there is new evidence which is material and that there is good cause for failure to incorporate such evidence into the record in a prior proceeding." Evidence is "material" "is there is a "reasonable probability that the Commissioner would have reached a different conclusion had the evidence been considered." <u>Perkins v. Chater</u>, 107 F.3d 1290, 1296 (7th Cir. 1997). Reichart has also not met his burden of justifying a remand under sentence six. The MRIs predate the ALJ's decision, and Reichart has failed to provide any reason for not producing them before the decision. Reichart a makes no arguments supporting good cause or materiality. Having reviewed the documents, the Court also finds the additional evidence submitted to the Appeals Council is not material because it does not address any functional limitations prior to June 30, 2001, his last date insured. (Tr. 427, 429, 430-33). Nothing in the December 2004 MRIs or Dr. Khan's January 2005 notes establishes that Reichart was disabled prior to June 5, 2001, so none of these documents would have caused the ALJ to rule differently.

## IV.    CONCLUSION

For these reasons, the ALJ's decision is supported by substantial evidence. Plaintiff's Motion for Summary Judgment is denied, and the Commissioner's Motion for Summary Judgment is granted. Pursuant to sentence four of 42 U.S.C. 405(g), the ALJ's decision is affirmed. The Clerk is directed to enter final judgment in favor of the Commissioner and against the Plaintiff in accordance with Rule 58 of the Federal Rules of Civil Procedure.

E N T E R:

Nan R. Nolan

_____
**Nan R. Nolan**
**United States Magistrate Judge**

**Dated:  December 7, 2006**